## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| S. COURTNEY E. COLLIER,<br><br>            **Plaintiff,**<br><br>   v.<br><br>SEI INVESTMENTS COMPANY, TODD CIPPERMAN, EDWARD LOUGHLIN, RICHARD LIEB, KEVIN JOHNSTON, KEVIN ROBINS and MARK NAGLE,<br><br>            **Defendants.** | Civil Action No.  02-3574 |

## O R D E R

**AND NOW**, this _____ day of _____, 2003, upon consideration of Defendants' Motion for Leave to File a Reply Memorandum in Further Support of its Motion for Summary Judgment, and any responses thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED**, and the Clerk shall docket the Reply Memorandum attached to Defendant's Motion at Exhibit 1.

BY THE COURT:

_____

SAVAGE, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

S. COURTNEY E. COLLIER,

                        **Plaintiff,**

      v.

SEI INVESTMENTS COMPANY, TODD
CIPPERMAN, EDWARD LOUGHLIN,
RICHARD LIEB, KEVIN JOHNSTON,
KEVIN ROBINS and MARK NAGLE,

                        **Defendants.**

Civil Action No.  02-3574

## DEFENDANTS' MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM
## IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendants SEI Investments Company ("SEI"), Todd Cipperman, Edward

Loughlin, Richard Lieb, Kevin Johnston, Kevin Robins and Mark Nagle (collectively

"Defendants"), by their attorneys, Morgan, Lewis & Bockius, LLP, hereby request that this

Court enter the attached Order granting Defendants leave to file the attached Reply

Memorandum of Law in Further Support of its Motion for Summary Judgment.  In support of the

foregoing, Defendants aver as follows:

          1.      Defendants filed their Motion for Summary Judgment on May 19, 2003.

          2.      Plaintiff's Opposition to Defendants' Motion for Summary Judgment,

filed on June 5, 2003, contains many assertions that are unsupported by any record facts or are

otherwise erroneous.  In addition, many of the arguments in Plaintiff's Opposition are premised

upon Plaintiff's position that she timely responded to Defendants' First Requests for Admissions,

and therefore that the facts in those Requests are not deemed admitted.  As set forth in detail in

Defendants' Opposition to Plaintiff's Motion for Withdrawal or Amendment of Admissions,

Defendants' Requests should be deemed admitted because Plaintiff's Answers to Defendants' Requests for Admissions were both untimely and insufficient under Federal Rule of Civil Procedure 36.

      3.     Defendants' Reply Memorandum of Law in Further Support of its Motion for Summary Judgment (attached hereto at Exhibit 1) is narrowly focused and specifically addresses the issues raised in Plaintiff's Response.

      4.     Defendants are now seeking relief to file their Reply Memorandum in Support of their Motion for Summary Judgment and respectfully requests that this Court grant their Motion in order to respond to certain arguments set forth by Plaintiff.

      **WHEREFORE,** for all the foregoing reasons, Defendants respectfully request that the Court grant their Motion for leave to file a Reply Memorandum of Law in Further Support of their Motion for Summary Judgment.

Respectfully submitted,

MICHAEL L. BANKS (PA ID NO. 35052)
JENNIFER C. BELL (PA ID NO. 81045)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5387/5186

Dated: June 18, 2003

## CERTIFICATE OF SERVICE

I, Jennifer Calabrese Bell, hereby certify that a true and correct copy of Defendants'

Motion for Leave to file a Reply Memorandum in Support of Motion for Summary Judgment,

has been served via hand delivery this 18th day of June, 2003, upon the following:

Alan B. Epstein, Esquire
Seven Penn Center
1635 Market Street, 7th Floor
Philadelphia, PA  19103

_____
JENNIFER CALABRESE BELL

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

S. COURTNEY E. COLLIER,

                    **Plaintiff,**

      v.

SEI INVESTMENTS COMPANY, TODD
CIPPERMAN, EDWARD LOUGHLIN,
RICHARD LIEB, KEVIN JOHNSTON,
KEVIN ROBINS and MARK NAGLE,

                    **Defendants.**

Civil Action No.  02-3574

### DEFENDANTS' REPLY BRIEF IN SUPPORT
### OF THEIR MOTION FOR SUMMARY JUDGMENT

On May 19, 2003, Defendants SEI Investments Company ("SEI"), Todd Cipperman,

Edward Loughlin, Richard Lieb, Kevin Johnston, Kevin Robins and Mark Nagle (collectively

"Defendants") moved for summary judgment in the above captioned action on all counts of

Plaintiff's Complaint.  Plaintiff's claims in this matter arise from her assertions that Defendants

discriminated against her on the basis of her race and/or gender and retaliated against her for

filing an internal complaint of discrimination by denying her a promotion, transferring her to a

new position and ultimately terminating her employment with SEI.  As set forth in Defendants'

Motion for Summary Judgment, Plaintiff's own admissions[1] in this matter, by themselves, largely

preclude her claims of discriminatory/retaliatory transfer, termination and failure to promote.  In

---

[1]    As set forth in detail in Defendants' Opposition to Plaintiff's Motion for Withdrawal or
Amendment of Admissions, notwithstanding Plaintiff's assertion that Plaintiff timely
served responses to Defendants' Requests for Admissions, there are serious questions
about whether Plaintiff's contentions in this regard are credible.  Accordingly, because
Plaintiff likely failed to provide timely responses and the responses that were eventually
provided did not meet the basic criteria of Rule 36, all of the facts set forth in Defendants'
Requests for Admissions should be deemed admitted.

addition, Plaintiff has not established the causal connection necessary to maintain her retaliation claims. Despite Plaintiff's attempts to bootstrap her retaliatory discharge claim onto her retaliatory demotion claim, Plaintiff cannot hold Defendants responsible for a wholly unintended and unanticipated consequence of their decision to transfer her to a position which provided her with the same benefits and salary as her prior position. In other words, even if this Court finds that there are factual disputes as to Plaintiff's claims relating to her tenure in the legal department and her transfer into a business position in July 2000, such disputes do not open to scrutiny the undisputed facts relating to her termination in an April 2002 reduction in force.

In her Opposition to Defendants' Motion for Summary Judgment, Plaintiff has failed to show that any genuine issue of material fact exists as to any of her claims or that Defendants are not entitled to judgment as a matter of law. Indeed, Ms. Collier is unable to adduce any facts that support her position that the employment decisions at issues were motivated by race or gender discrimination or by retaliation. Plaintiff conveniently ignores many of Defendants' arguments, leading to the conclusion that she is unable to rebut Defendants' numerous bases for dismissing her claims. Instead, Ms. Collier relies on speculation and conclusory statements as substitutes for the facts she lacks to establish the most basic elements of her claims. Plaintiff's efforts are simply insufficient to survive summary judgment. Accordingly, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Plaintiff's claims in their entirety.

## II.     **ARGUMENT**

In their Statement of Undisputed Facts and Memorandum of Law in Support of Their Motion for Summary Judgment, Defendants set forth in detail the multitude of deficiencies in Plaintiff's claims. In her Opposition, Plaintiff concedes that she has an insufficient basis for her claims for a hostile work environment and a failure to promote her to the position of Head of Operations, Mutual Funds. (See Pls. Mem. of Law, at p. 5, Pls. Counter-Statement of Facts, at p. 12). Accordingly, the remaining claims at issue relate to Plaintiff's application for the position of

2

Director of Workforce Development, her transfer to a position as Vendor Manager and her

termination as part of a reduction in force that was implemented almost two years after her

transfer out of the Legal Department.[2/] As set forth below, none of the conclusory allegations

made in Plaintiff's Opposition to Defendants' Motion for Summary Judgment change the fact that

Plaintiff has admitted crucial facts that preclude the great majority of her claims.  Moreover, as

---

[2/]   Plaintiff's Opposition does not directly address the issue of whether Plaintiff is still
attempting to bring an independent claim for unequal pay.  In fact, her own affirmative
admission that "her salary during her employment with SEI was appropriate, in light of
her skills and experiences" leaves no hope for an unequal pay claim.  (See Plaintiff's
Answers to Defendants' Requests for Admission, attached hereto as Exhibit A, No. 2).  In
addition, and as set forth in detail in Defendants' Memorandum of Law, Plaintiff cannot
maintain such a claim because of her inability to demonstrate that similarly situated male
and/or white employees were compensated at a higher rate for "substantially equal" work.
See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087 (3d Cir. 1996).  Although
Plaintiff makes the conclusory allegation that "…Cipperman gave me salary increases
which were lower than the Caucasian and male employees who were similarly situated to
me and denied me fringe benefits including stock options and selection to attend
president's club," she makes no attempt to refute the cases cited by Defendants regarding
her burden to come forth with specific evidence.  (See Affidavit of Courtney Collier,
attached hereto as Exhibit B, at ¶ 11).  The conclusory use of the term "similarly situated"
does not come close to showing with facts that her "employment situation [is] nearly
identical to those of the …employees whom he alleges were treated more favorably."
Miller v. Delaware, Dep't of Probation and Parole, 158 F. Supp.2d 406, 411 (D. Del.
2001).  Plaintiff still has not identified a single person who was paid more than she, and
whose position was "substantially equal."  Plaintiff certainly cannot rescue her unequal
pay act claim by relying upon a company wide confidential compensation analysis
performed by SEI before June of 1999, at a time when by Plaintiff's own admission she
was satisfied with the treatment she was receiving in the Legal Department and with her
salary.  (See Deposition of Courtney Collier ("Collier dep."), attached hereto as Exhibit C,
at 122-128, 270-273).  As discussed in detail in Defendants' Motion in Limine, the
compensation analysis simply provides broad titles and salaries of various SEI employees:
it neither establishes that any of the individuals from the legal department are "similarly
situated" to Plaintiff nor accounts for important variables such as prior work experience,
levels of responsibility, skill, and level of performance.  See Ogden v. Keystone
Residence, 226 F.Supp. 2d 588, 603 (M.D. Pa. 2002) (Plaintiff could not make out *prima
facie* case unequal pay claim under Title VII where Plaintiff admitted that she had no
knowledge of comparative employee's prior experience or other facts and thus could not
establish comparator was "similarly situated").

before, Plaintiff cannot articulate a sufficient reason why she believes that any of the decisions at issue were made <u>because of</u> her race or gender. (<u>See</u> Collier dep., at 118-119).[3]

Instead, Plaintiff relies heavily on her unsupported generalization that Defendants had a discriminatory motive because of "the overwhelming evidence establishing that the ...mistreatment of Collier was part of a pattern and practice of SEI's discriminatory actions against female and African American employees..." Of course, Plaintiff has offered no such evidence.[4] Similarly, her attempt to establish the causal connection between her internal complaint and her termination almost two years later, is wholly insufficient.

**A.    Ms. Collier Cannot And Did Not Adduce Any Evidence To Prove That She Was Better Qualified Than Alice Lindenauer For The Workforce Development Director Position.**

Assuming that Plaintiff can establish a *prima facie* case of race[5] discrimination as to her application for the position of Director of Workforce Development, Plaintiff has not set forth any facts to refute Defendants' legitimate non discriminatory reason for selecting Ms. Lindenauer for the position. Without citation, Plaintiff asserts that "Collier was far more suited for that position than the vendor manager position and was more qualified than Lindenauer." (<u>See</u> Pls. Mem. of

---

[3]    Plaintiff cannot formulate a theory as to why she thinks the numerous criticisms of her performance by every one of her superiors at SEI were based on her race or gender, other than her unsupported assertions that Cipperman "treated me different from my white colleagues," and that her "compensation was a lot less than women similarly situated in the Legal Department." <u>See</u> Collier dep., at pp. 118-119.

[4]    As discussed in detail in Defendants' Motion in Limine, for a variety of reasons, Plaintiff's "evidence" relating to the theme of events during SEI's Leadership Club trips, the composition of SEI's Vision Task Force and invitees to SEI's Leadership Club, and a Confidential Compensation Analysis is not probative of Plaintiff's claims and should be excluded.

[5]    Defendants assume that Plaintiff's promotion claim is based only on her race, as a woman was ultimately selected for the Workforce Development job. This would preclude Plaintiff from establishing the fourth prong of *prima facie* case: that "non members of the class were treated more favorably." <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 522 (3d Cir. 1992), <u>cert. denied</u>, 510 U.S. 826 (1993).

Law, at p. 18). None of Plaintiff's conclusory statements regarding her qualifications can overcome the admission that Ms. Lindenauer was qualified for the job, and that Plaintiff's qualifications were not superior to Ms. Lindenauer's. (See Defendants' First Requests for Admissions, attached hereto as Exhibit D, Nos. 18, 19).[6/] Given these admissions, Plaintiff cannot come close to establishing that Defendants' legitimate non discriminatory reason was a pretext for race discrimination.

Plaintiff's claim that SEI retaliated against her by selecting Ms. Lindenauer for the Director of Workforce Development position is even weaker than her discriminatory failure to promote claim. As with her discrimination claim, Plaintiff's retaliation claim is foreclosed by the same admissions based on her failure to respond on a complete and timely basis to Defendants' Rule 36 Request. In addition, Plaintiff has not established a *prima facie* case of retaliation because she has proffered no facts to establish the necessary causal connection between her internal complaint and SEI's selection of Ms. Lindenauer for the position. To the contrary, Plaintiff has not even cited a single fact showing that any person who was involved in the decision to select Ms. Lindenauer for the position even knew that she had filed an internal complaint of discrimination. Accordingly, Plaintiff's discriminatory and retaliatory promotions claims should be dismissed with prejudice.

**B.    Ms. Collier's Admissions That She Requested To Leave the Legal Department And That Her Transfer To A Vendor Management Position Was Not A Demotion Preclude Her Claims For Discriminatory or Retaliatory Demotion.**

As with Plaintiff's failure to promote claim, Plaintiff's demotion claim is foreclosed by two critical admissions regarding the circumstances relating to her transfer to the Vendor

---

[6/]    If, as Defendants have argued, the Requests for Admissions are deemed admitted as a result of Plaintiff's untimely and non-compliant responses, then there is no legitimate dispute as to the selection of Ms. Lindenauer.

Management position. First, as Plaintiff cannot deny in light of her failures under Rule 36, her

reassignment to the Vendor Manager position was not a demotion. (See Defendants' First

Requests for Admissions, No. 15). Indeed, her transfer did not result in any reduction in her

salary or benefits. Under these circumstances, Plaintiff cannot establish a prima facie case of race

or gender discrimination, because she has not suffered any adverse employment action. See

Robinson v. Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997).

    In her Opposition, Plaintiff points to the lack of legal work in the Vendor Manager

position, the loss of her title of Vice President and the location of the Vendor Manager position

outside from corporate headquarters as evidence that the transfer was in fact a demotion. (See

Pls. Mem. of Law, at p. 17). Ms. Collier also claims that she was subjected to "humiliating"

requirements such as having to account for her attendance, but she does not provide any support

for her conclusory assertion that "This type of action was not taken against any of the male and

white employees" who worked in the same building. (See Pls. Mem. of Law, at p. 18). Even if

Plaintiff had suffered an adverse employment action sufficient to establish a *prima facie* case of

discrimination or retaliation, Defendants have articulated a legitimate non discriminatory reason

for her transfer – Ms. Collier's repeated requests to leave the Legal Department. Ms. Collier's

admission – again, based on her Rule 36 failures – that the reassignment was a direct result of her

expressed unwillingness to continue working in SEI's Legal Department precludes her from

establishing that Defendants' legitimate nondiscriminatory reason for the transfer was a pretext

for discrimination or retaliation. In fact, Ms. Collier told several individuals that she wished to

leave the Legal Department both orally and in writing, including Kevin Johnston, Mark Nagle and

Todd Cipperman. (See Letter from C. Collier to K. Johnston dated July 12, 2000, attached hereto

as Exhibit E; Deposition of Mark Nagle ("Nagle dep."), attached hereto as Exhibit F, at 30;

Deposition of Todd Cipperman ("Cipperman dep."), attached hereto as Exhibit G, at 96-97).

Having requested a transfer, and having been granted one to a lateral position with identical pay

and benefits, Ms. Collier cannot claim retaliation merely because the position was not ideal in her subjective opinion.

> **C.    Plaintiff Has Offered No Evidence That The Reduction In Force That Eliminated Her Department Was A Pretext For Race Or Gender Discrimination, Nor Can She Establish Any Causal Connection Between Her Internal Complaint And The Later Reduction In Force.**

In her Opposition, Plaintiff suggests weakly that her termination was the result of discrimination on the basis of her race or gender.  She does not deny that there was an economic reduction in force that resulted in the elimination of her department, and the termination of both Vendor Managers, as well as numerous other SEI employees.  In fact, Plaintiff has never come forward with any evidence that her termination was motivated by discrimination, or that the decision-maker on the termination claim was biased.[7/]

Nevertheless, Plaintiff continues to maintain that her termination, which she admitted was the result of a reduction in force, is retaliatory and somehow connected to her filing of an internal complaint of discrimination almost <u>two years</u> before her termination.  In order to maintain any retaliation action, Plaintiff must establish that "a causal link exists between her protected activity and [SEI's] adverse action."  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 (3d Cir. 2000).  As set forth in detail in Defendants' Memorandum of Law, the mere time lapse between Plaintiff's protected activity and her termination weakens Plaintiff's ability to establish a causal connection.[8/]  The greater obstacle, however, is the absence of any nexus between the transfer in July 2000 and the much later reduction in force in April 2002.

---

[7/]    In any event, as discussed below with respect to her retaliation claim, Plaintiff's ability to challenge Defendants' legitimate non discriminatory reason for her termination is severely limited by her admissions regarding her termination and the reduction in force.

[8/]    <u>See</u>, <u>e.g.</u>, <u>Johnson v. Souderton Area Sch. Dist.</u>, No. Civ. A. 95-7171, 1997 WL 164264, at *7-8 (E.D. Pa. Apr. 1, 1997) (finding time periods of four and nine months between protected activity and alleged adverse actions too large to establish causal nexus); <u>Woods</u> (continued).

Essentially, Plaintiff contends that because she believes her transfer to the Vendor Manager position was retaliatory, any employment actions taking place after that transfer are also retaliatory, regardless of whether there was any linkage. See Pls. Mem. of Law at p. 30 ("Collier was transferred to this "eliminated" position in the first place in retaliation for her complaints and would not have been terminated has she not been transferred out of the legal department."). Even assuming, arguendo, there was some basis to treat the July 2000 transfer as retaliatory, the assertion that any subsequent employment action, no matter how far removed, is also retaliatory, strains credulity.

The record evidence is that the decision to transfer Ms. Collier to the Vendor Manager position was made by Todd Cipperman, Kate Stanton and Kevin Johnston. (See Cipperman dep., at 98). Mr. Nagle was simply asked by Rick Lieb if he would be willing to hire Ms. Collier into the position of Vendor Manager. Based upon Ms. Collier's previous indications to Mr. Nagle that

v. Bentsen, 889 F. Supp. 179, 187 n. 15 (E.D. Pa. 1995) ("[C]ourts generally hold that if at least four months pass after the protected action without employer reprisal, no inference of causation is created."). In her Opposition, Plaintiff contends that to meet the causation requirement she "is only required to establish that defendants had reason to know of her protected activities before the adverse actions occurred." (See Pls. Mem. of Law, at p. 25 (citing Azzaro v. County of Allegheny, 110 F.3d 968, 973-75 (3d Cir. 1997)). In fact, much more is required to establish causation, particularly in this context. Azzaro held that where there was significant evidence that Defendants had put Plaintiff on a "hit list" following her protected activity and were planning throughout to terminate her employment, the lack of temporal proximity between the activity and the adverse employment action was not determinate. Azzaro, 110 F.3d at 974. Plaintiff, in contrast, cannot point to any evidence that Defendants planned to terminate her employment throughout the period that she was employed as a Vendor Manager. Instead, she points to her own actions during that period to support causation, asserting that Defendants' "antagonism" was "apparently refueled by her accusatory emails, internal and external filings and a private mediation..." (See Pls. Mem. of Law, at p. 27). Plaintiff has never alleged the Mark Nagle, the undisputed decisionmaker as to her termination, plotted to compromise her position as a Vendor Manager. In fact, Plaintiff testified that the only dispute she had with Mr. Nagle related to his participation in a promotion decision that is no longer at issue in this case, and his alleged agreement to accept her into his organization when she was being transferred from the legal department. (See Collier dep., at 219). Such conduct by Mr. Nagle does not reflect hostility or animus, or an impermissible motive.

she wanted to find a position outside of the legal department, Mr. Nagle believed that Ms. Collier had requested the transfer to the Vendor Manager position. (Nagle dep., at 45-46). He was unaware at the time that Ms. Collier had ever complained internally. (Id.).

After Plaintiff transferred out of the Legal Department, she no longer reported to Defendants Cipperman and Robins, the General Counsel and predecessor General Counsel to whom she reported in the Legal Department. Instead, she was in a business position in a unit that was run by Mr. Nagle, a Senior Vice President. Plaintiff does not allege that Mr. Nagle was controlled or influenced by Mr. Robins or Mr. Cipperman, or by any other Defendant. In fact, he was not, and he operated independently of Mr. Robins and Mr. Cipperman. As Mr. Nagle explained without contradiction, his decision to terminate Ms. Collier and the other Vendor Manager was based strictly on business considerations, in the face of broader workforce reductions at SEI. (See Nagle dep., at 52-54, 58-59; Declaration of Mark Nagle, attached hereto as Exhibit H, at ¶ 6).

Under these circumstances, the contention that Mr. Nagle's decision to terminate Ms. Collier's employment was in any way part of a continuing retaliation against her for filing an internal complaint is untenable. Accordingly, Plaintiff cannot establish the necessary causal connection to meet her *prima facie* case.

Moreover, even if Plaintiff could make out a *prima facie* case of retaliatory discharge, her termination claim is untenable because she cannot dispute SEI's legitimate non discriminatory reason for terminating her employment. Plaintiff has admitted that her employment was terminated as a result of a reduction in force, which resulted in the elimination of her department. In her Opposition, Plaintiff refers obliquely to a "convenient restructuring," and claims that the facts relating to Defendants' legitimate non discriminatory reason for her termination are filled with "contradictions and discrepancies." (See Pls. Mem. of Law at p. 18). However, Plaintiff points to no facts which cast any doubt of Defendants' proffered reason for Plaintiff's

termination, especially in light of Plaintiff's admissions in this regard. Plaintiff claims that the reduction in force is suspect because "only two people were laid off." (See Pls. Mem. of Law, at p. 14). This assertion mischaracterizes the record evidence. The reduction in force involved the termination of several dozen employees. (See Cipperman dep., at p. 141). In fact, as Mark Nagle testified, Plaintiff's department was eliminated in the reduction in force and no one in Plaintiff's department has been rehired. (See Nagle dep., at pp. 53-56; Declaration of Mark Nagle, at ¶ 6).

Plaintiff's unsupported speculation does not come close to the evidence necessary to refute Defendants' legitimate non discriminatory reason. To survive summary judgment, a plaintiff must rather "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 763-65 (3d Cir. 1994) (citations omitted) (emphasis added). A plaintiff "must show . . . not merely that the employer's proffered reason was wrong, but that it was *so plainly wrong* that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1998) (emphasis added). Here, Plaintiff has failed to make such a showing.

## III.   **CONCLUSION**

For the forgoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss the Complaint of Plaintiff Courtney Collier with prejudice.

Respectfully submitted,

MICHAEL L. BANKS
JENNIFER CALABRESE BELL
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA   19103-2921
215.963.5387/5186

Dated:  June 18, 2003

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S. COURTNEY E. COLLIER | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| SEI INVESTMENTS COMPANY, *et. al.* | : | |
| | : | |
| | | |
| Defendants. | : | No. 02-3574 |

## PLAINTIFFS ANSWERS TO DEFENDANTS' REQUESTS FOR ADMISSIONS

|        |          |
|--------|----------|
| 1-3.   | Admitted |
| 4.     | Denied   |
| 5.     | Denied   |
| 6.     | Admitted |
| 7-12.  | Denied   |
| 13.    | Admitted |
| 14.    | Admitted |
| 15.    | Denied   |
| 16.    | Admitted |
| 17-20. | Denied   |
| 21.    | Admitted |
| 22.    | Denied   |
| 23.    | Denied   |
| 24-29. | Admitted |

30.        Denied

_____
Alan B. Epstein
SPECTOR GADON & ROSEN
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8888

DATED:        April 24, 2003

## VERIFICATION

I, Alan B. Epstein, hereby state that I have been authorized to take the following verification on behalf of my client, S. Courtney E. Collier and verify that the foregoing Answers to Defendants' Requests for Admissions are true and correct to the best of my personal information, knowledge and belief.

I further understand that the statements made therein are subject to the penalties of 18 Pa.C.S.A.§4904 relating to the unsworn falsification of authorities.


_____
Alan B. Epstein


DATED:      April 24, 2003

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

S. COURTNEY E. COLLIER,                  :

          Plaintiff,                          :

                         :

          v.                                  :       Civil Action No. 02-3574

SEI INVESTMENTS COMPANY, TODD :
CIPPERMAN, EDWARD LOUGHLIN,       :
RICHARD LIEB, KEVIN JOHNSTON,     :
KEVIN ROBINS and MARK NAGEL,      :

          Defendants.                         :

## AFFIDAVIT OF S. COURTNEY E. COLLIER, ESQUIRE

        S. Courtney E. Collier, Esquire, being duly sworn, hereby deposes and states as follows:

        1.    I am the Plaintiff in the civil action of *Collier v. SEI Investments Company* ("SEI"), *Todd Cipperman* ("Cipperman"), *Edward Loughlin* ("Loughlin"), *Richard Lieb* ("Lieb"), *Kevin Johnston* ("Johnston"), *Kevin Robins* ("Robins"), *and Mark Nagle* ("Nagle"), (Civil Action No. 02-3574) which was filed in the United States District Court in the Eastern District of Pennsylvania.

        2.    At the time of my hire in 1998, Lori White ("White") was my immediate supervisor. In the or about the spring of 1999, Kevin Robins, Esquire ("Robins"), who was then the General Counsel and Senior Vice-President, served as my immediate supervisor for a short time. Ms. White never unfairly criticized my work performance and verbally complemented the work I had completed in the area of the Roth IRA. Mr. Robins was pleased with my performance and provided me with positive feedback regarding my performance.

3.    Additionally, during my evaluation in May or June of 1999, Robins informed me that he had spoken with my clients who were pleased with my performance.

4.    Further, Joseph Ugobia ("Ugobia") who was the Managing Director of SEI's European operations, was so pleased with my work that he advised me that he would be interested in hiring me for the position of Director of Operations for a joint venture which was in the works with a French company.  This was exciting to me since the position would utilize my abilities as a lawyer, promote me to a high level administrative position within the ranks of SEI and permit me to employ my fluency in the French language.

5.    Todd Cipperman ("Cipperman") became the General Counsel in approximately January of 2000, but was transitioning into this role beginning in the fall of 1999.

6.    Cipperman subjected me to discriminatory treatment based on both my race and gender which included, but was not limited to, persistent and frequent unwarranted criticisms and degrading conduct.  An example of his frequent discriminatory conduct is the time during a presentation to the legal team regarding the Roth IRA, he continually questioned me regarding issues unrelated to the topic in order to make me appear incompetent.

7.    Cipperman also berated me in front of other employees and criticized my legal ability through e-mails which he unnecessarily and improperly published to the entire legal department.

8.    Cipperman often raised his voice while publically and privately speaking to me and overloaded me with another attorney's work without providing me any assistance, despite my request for the same.

9.    Cipperman did not treat the Caucasian female attorneys in the department or the male attorneys in a similar manner.

10.    Cipperman additionally harassed Cynthia Parish, who was another African-American female attorney in the group, and indicated to her at one point that he was going to hire a Compliance Attorney who would report to her on compliance matters, but he would pay the attorney reporting to her more than he would pay her as the supervisor.

11.    Moreover, Cipperman gave me salary increases which were lower than the Caucasian and male employees who were similarly situated to me and denied me fringe benefits including stock options and selection to attend the President's Club.

12.    As a result of the above, I complained to Mr. Cipperman's supervisor, Kevin Robins as early as January 2000 and complained to the person in charge of SEI's Human Resource function, Kevin Johnston, both verbally and in writing averring that Cipperman's actions were based upon my race and gender.

13.    Notwithstanding my complaints, the Defendants failed to take any remedial action and instead subjected to me to retaliation which included demoting me to a non-legal position out of the legal department as a Vendor Manager.

14.    Further, the person selected to conduct an investigation into my complaints (executive Edward Loughlin), neglected his duties and undertook only to discredit my performance rather than inquire into my allegations.

15.    Mr. Loughlin did not perform a thorough investigation only briefly speaking to me on one occasion and never asking me to provide any witnesses regarding my allegations of discrimination.

16.    Up until the time of my termination, I repeatedly complained about my removal to the position of Manager of Vendor Programs which I aver was a demotion because I was: moved out of the legal department and lost my status as an attorney; moved to a remote location three miles from company headquarters; and made to perform work under individuals with less credentials than me.  My complaints went unaddressed.

17.    Subsequent to my complaints of discrimination to Robins and Johnston, my effort to obtain an acceptable position as the Director of Workforce Development was unjustifiably rejected and the Defendants discriminatorily selected a candidate with lesser qualifications.

18.    After my transfer and during the pendency of my administrative charges of discrimination and during the process of mediating these matters before former Federal Judge Edward Cahn, the position of Manager of Vendor Programs was eliminated and I was terminated from employment.  My employment would not have been terminated if the Defendants transferred me to an established position as opposed to a newly created position which they should have known would have been dissolved.  Additionally, no efforts were taken by SEI to permit my transfer to another position with the company that was not being eliminated.

19.    I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.  I understand that the foregoing statements are made subject to the penalties of 28 U.S.C. §1746 and 18 Pa. C.S.A. §4904 relating to the unsworn falsification of authorities.

S. COURTNEY E. COLLIER, ESQUIRE

Dated: June 4, 2003

# EXHIBIT C

S. COURTNEY E. COLLIER

118

gender and race?

A.    Anything else other than what I have already told
you?

Q.    Yes.

A.    Well --

Q.    No, no.  That's actually not what I'm asking.
I'm not asking whether there's anything else beyond
what you've told me.

          What I'm asking is, what makes you believe
that was because of your gender, or the combination of
your gender and race?

A.    Again, because he treated me differently from my
white colleagues.

Q.    But let's put aside race for a moment.

A.    Okay.

Q.    Just focus on gender.  There were other women in
the group, right?

A.    Um-hum.  That's right.

Q.    You felt he treated you worse then he treated
other women in the group, correct?

A.    Yes.

Q.    Okay.  Do you believe your gender was a factor in
him treating you worse than other women in the group?

A.    Yes, I do.

S. COURTNEY E. COLLIER

119

1   Q.    What leads you to believe your gender is a

2   factor?

3   A.    Because I -- my compensation was a lot less than

4   women similarly situated in the Legal Department.

5   Q.    Okay.

6           Why does that indicate to you that

7   Mr. Cipperman discriminated against you based on your

8   gender?

9   A.    Again, they -- they were compensated on a higher

10  level than I was.  They were given --

11  Q.    Who --

12  A.    I'm sorry.  Go ahead.

13  Q.    Go ahead.

14  A.    No, that's fine.

15  Q.    Who set your compensation initially?

16  A.    Kevin Robins.

17  Q.    Am I correct you only reported to Mr. Cipperman

18  for six or seven months?

19          He became general counsel in early 2000.

20  And you were moved out of the Legal Department in July

21  of 2000 --

22  A.    Um-hum.

23  Q.    -- right?

24  A.    That's right.

S. COURTNEY E. COLLIER

122

1    hear.  And he told me he didn't really want to hear

2    what Todd had done.

3              He wanted to know what day I was going to

4    leave.  He wanted me to give him a day.  He said I

5    could wait and tell him overnight, but he wanted to

6    know what day I was going to leave.

7    Q.    This was in the spring or summer of 2000, after

8    you had complained internally, right?

9    A.    Yes.

10   Q.    At that point, Mr. Robins was no longer in the

11   Legal Department; is that correct?

12   A.    That's right.

13   Q.    You started at SEI in 1998?

14   A.    Yes.

15   Q.    February of '98, correct?

16   A.    Yes.

17   Q.    Mr. Robins was general counsel at that time?

18   A.    Yes.

19   Q.    And you reported directly to Mr. Robins for about

20   two years?

21   A.    Yes.

22   Q.    During that time, did Mr. Robins say or do

23   anything that you believe reflected discrimination

24   against you, because of your race or gender or both?

S. COURTNEY E. COLLIER

123

1  A.    I don't recall.

2  Q.    Did he say or do anything during that time, that

3  you considered to be unfair or irrational towards you?

4  A.    Well, you know, I don't remember everything he

5  said over the years.  So I don't know if it was

6  irrational or unfair.  I mean, I don't --

7  Q.    Sitting here today, can you look back and think

8  of anything that Mr. Robins said or did that was

9  directed at you, that you felt was irrational or

10  unfair?

11  A.    There was one instance where he -- I was asked

12  when I first came on as a temp to become an expert in

13  the Roth IRA, and asked to pull together a manual.  And

14  that was it, because no one else -- there was no --

15  they had no resident expert.  And so I started doing

16  that.

17            And after I finished with the manual, I

18  presented it to the legal group.

19            And this is another time when Todd totally

20  picked me apart in the meeting.

21            And Kevin Robins afterwards, said he thought

22  it was a really good product.  That we might be able to

23  sell it to our clients.

24            And I presented it to another group -- and I

S. COURTNEY E. COLLIER

124

1  don't remember the name of the group.  It was a group

2  that actually wanted the document.

3        But they wanted it months before I, you

4  know, came on board.  And when they saw it, they were

5  like, you know, this is great, but this is so late.

6  It's too late, you know, for us to be -- to present

7  this to clients, and we wanted this months ago.  This

8  isn't going to help us now.

9        So after that, Kevin said, you know, this

10 isn't what they need.  You should have made it much

11 more succinct.

12        And I said, okay, but I thought that you

13 liked it.

14        And he said, well, this isn't what you --

15 you made it too complicated.

16        So I said, okay, I'll go back to the drawing

17 board.  And I did.  And eventually they liked it, but

18 they said they still felt that it was months too late.

19        And Kevin -- and after that, you know, Kevin

20 said, you know, Courtney, you need to -- you should

21 have made this more succinct or something like that, to

22 begin with or something.

23        I said, I had no directions.  And you told

24 me it was good.  And, you know --

S. COURTNEY E. COLLIER

125

1          So I just felt that was a little irrational,

2    but --

3    Q.    But you don't think was racial or --

4    A.    No.

5    Q.    -- gender discrimination?

6    A.    No.

7    Q.    You felt that he had behaved irrationally by

8    changing his assessment of your work after the business

9    people spoke up?

10    A.    Yes.

11    Q.    Is there anything else you can think of that he

12    said or did, that was irrational or unfair towards

13    you --

14    A.    Not right now.

15    Q.    -- during the time that he was your superior?

16    A.    Right.  Not right now, except what I said before

17    with the -- asking me to leave instead of investigating

18    the situation.

19    Q.    Was it your understanding that Mr. Robins was the

20    one who determined your initial salary?

21    A.    That's my understanding.  He was the general

22    counsel.

23    Q.    Do you know anyone else who was involved in that

24    process?

S. COURTNEY E. COLLIER

126

1   A.    I don't know.

2   Q.    Do you think that Mr. Cipperman continuing to

3   approve the salary that Mr. Robins had established for

4   you, was discriminatory?

5   A.    You mean the fact that I didn't get a raise?

6   Q.    Yes.

7   A.    I felt that the fact that other people made a lot

8   more than I was making was discriminatory.

9   Q.    That pattern was established by Mr. Robins,

10  wasn't it?

11  A.    No.

12        The initial salary was established by

13  Mr. Robins.

14  Q.    Mr. Robins set your salary for 1998, when you

15  first became a full-time employee, correct?

16  A.    Correct.

17  Q.    He set your salary again in 1999?

18  A.    Yes.

19  Q.    Did he increase it?

20  A.    Yes.

21  Q.    Then who set your salary for the year 2000?

22  A.    I don't remember.

23  Q.    Do you have reason to believe that Mr. Cipperman

24  was involved in any way in determining what your base

S. COURTNEY E. COLLIER

127

1  salary would be for the year 2000?

2  A.    I have no idea.

3  Q.    Do you have any reason to believe that

4  Mr. Cipperman was involved in setting your base salary

5  for the years 2001 and 2002?

6  A.    I have no idea.

7  Q.    Do you have any reason to believe he was involved

8  in your bonus for 2001?

9  A.    I have no idea.

10  Q.    How about for 2000?

11  A.    I don't know.

12  Q.    Sitting here today, is there any decision that

13  you can point to Mr. Cipperman having made over your

14  compensation, at any time?

15  A.    Again, I don't know what kind of influence Todd

16  had over what I was making.  I don't know.

17  Q.    Getting back to Mr. Robins, are you saying then

18  that the first thing that he did that you felt was

19  discriminatory was during the period when you and he

20  talked after he had moved out of the Legal Department?

21  A.    Right now, that's what I -- I remember.

22  Q.    And you've described him as urging you to leave

23  SEI; is that right?

24  A.    Yes.

S. COURTNEY E. COLLIER

128

1    Q.    What about Mr. Robins' conduct or statements at

2    that time leads you to believe that he was biased

3    against you because of your race or gender or both?

4    A.    Well, the fact that, you know, I explained to him

5    what was going on.  And from my perspective, it was

6    clear that it was discriminatory.  I explained to him

7    that that's what I thought.  And despite that, he

8    didn't bother to investigate or anything.

9          So that's what made me feel that this is a

10   man that really doesn't care, but let me just say there

11   are two other instances that I forgot.

12         When we decided to take on government

13   contracts and we needed a -- an affirmative action

14   coordinator, I told Kevin Robins, because he wanted me

15   to get involved -- actually, Kate Stanton first asked

16   me to get involved.

17         And I worked with her on the plan, and with

18   the outside counsel in charge of that.  We needed a

19   coordinator.

20         So I told Kate and Kevin that, you know, I

21   would be happy to do it.  I was already working on

22   employment issues.

23         And Kevin said, no.  I am going to give that

24   job to Michelle Beaudry, who was a recent graduate, no

S. COURTNEY E. COLLIER

219

A.    No, nothing other than what I just told you.

Q.    Again, other than Mr. Nagle hiring you for the
Vendor Management job, and his selection of Mr. Fogdo
instead of you for the mutual fund job, is there any
other information you have that forms the basis of your
claim against Mr. Nagle for discrimination?

A.    Not that I can think of at this time.

MR. BANKS:  Off the record for a
second.

THE VIDEO SPECIALIST:  Off the
video.  3:09.

(Whereupon, a discussion was held
off the record.)

MR. BANKS:  We are going to
adjourn the deposition for today.
Mr. Epstein and I will confer about a
mutually agreeable time to resume the
deposition.

He's endeavoring to get us some
discovery responses and documents.  And as
soon as we get those, we will talk and find
a date that works for everybody.

MR. EPSTEIN:  Michael, in that
regard, I have no objection of telling you

S. COURTNEY E. COLLIER

270

1  job if you protested Mr. Robins' refusal to show you

2  that evaluation?

3  A.    As I said before, it was the way that he said it

4  to me that all I needed to know was that I was getting

5  this bonus.    That was it.

6  Q.    But you said before --

7  A.    He was very --

8  Q.    I'm sorry.    Go ahead.

9  A.    He was very, very -- just -- he was upset at the

10 fact that he had to get involved in a situation where I

11 had already felt that Lori was treating me unfairly.

12 And when he got Lori's evaluation, he said this was --

13 that this is unfair.

14        He never showed it to me.    He told me it was

15 unfair.    He was going to redo it himself.    And he said

16 that, you know, this will be your bonus.

17        And I said -- and he -- and at that point,

18 he doubled my bonus.    It went from -- he said, I was

19 only going to give you 5,000, but I'm going to give you

20 10.

21 Q.    I think you said before, though, that up through

22 at least the September 29, 1999 time frame, you felt

23 that Mr. Robins had a very positive view of your

24 performance?

S.  COURTNEY E.  COLLIER

271

A.    He did.

Q.    And that he had been fair to you?

A.    Yes.

Q.    Well, if he had been fair to you and had a
positive view of your performance, can you think of any
reason why he would have been reluctant to show you
your evaluation?

A.    I have no idea why he was.  All I know is that he
was not happy at the time.

      When I asked if I could have a copy of it,
that is exactly what he responded to me, is what I told
you.

Q.    And you got a sense he was unhappy with you?

A.    No.  He was just unhappy with the situation.

      Kevin does not like confrontation at all.
And he just became very, very frustrated with the whole
situation.

      I mean, if there is a copy in my file,
you'll see it doesn't have my signature, because I
never saw it.

Q.    Other than Mr. Robins' tone, is there anything
else that led you to believe that if you protested or
tried to see your evaluation, that you might lose your
job?

S.  COURTNEY E.  COLLIER

272

A.    At the very least, I felt that I -- he would not
be happy with me.  And I did not want that.

Q.    Is there anything, though, other than the tone
that he displayed with you, that led you to believe
that you might lose your job if you pursued attempts to
see any evaluation by Mr. Robins?

A.    No.  Nothing other than his demeanor.

Q.    And there was nothing else that had happened up
to that point in your interaction with Mr. Robins that
led you to believe that he was critical of you or that
he had a negative view of you?

A.    No.

Q.    Nothing you heard about him up to that point,
that made you concerned about him either; is that
right?

A.    No.

Q.    That's not right or --

A.    I'm sorry.  No.

Q.    My question was bad.  Let me try to rephrase it.

A.    Uh-huh.

Q.    Had you heard anything up that point, that is, up
to the point you and he talked about your 1999
evaluation, that led you to believe that Mr. Robins had
a negative view of you or might be unfair in his

S. COURTNEY E. COLLIER

273

1  treatment of you?

2  A.    No.

3  Q.    Can we go back to this e-mail that Mr. Cipperman

4  sent that's in D-2?

5  A.    Uh-huh, sure.

6  Q.    I think you said that in the first sentence of

7  this e-mail, you objected to Mr. Cipperman suggesting

8  that the policy was set just by you; is that right?

9        The end of the first sentence.

10  A.   Yes.

11  Q.    If Mr. Cipperman had worded this e-mail by

12  putting a period after the word "group" in the first

13  line, and deleting the rest of that first sentence so

14  that the first sentence would read, "I think we should

15  discuss the handling of employment matters as a group,"

16  and then continuing with the rest of the e-mail --

17  A.    Well --

18  Q.    -- would you have found that inappropriate or

19  offensive?

20  A.    Well, let me just say this, Mr. Banks, so that

21  you understand the whole context of this, is that Todd,

22  Mr. Cipperman, if you will look at the -- okay -- the

23  second sentence, "Certain business people may go to

24  their usual lawyer manager with problems of an

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **S. COURTNEY E. COLLIER,**<br><br>                              **Plaintiff,**<br>    v.<br><br>**SEI INVESTMENTS COMPANY, TODD<br>CIPPERMAN, EDWARD LOUGHLIN,<br>RICHARD LIEB, KEVIN JOHNSTON,<br>KEVIN ROBINS and MARK NAGLE,**<br><br>                              **Defendants.** | **Civil Action No.  02-3574** |

### DEFENDANTS' FIRST REQUESTS FOR ADMISSIONS
### DIRECTED TO PLAINTIFF S. COURTNEY E. COLLIER

Defendants SEI Investments Company ("SEI"), Todd Cipperman, Edward Loughlin, Richard Lieb, Kevin Johnston, Kevin Robins and Mark Nagle (collectively "Defendants") through their undersigned attorneys and pursuant to Federal Rule of Civil Procedure 36, hereby request that Plaintiff S. Courtney E. Collier ("Plaintiff") admit the matters set forth in the following Requests for Admissions within thirty (30) days of the date of service hereof.

Each matter set forth as a Request for Admission shall be deemed admitted unless Plaintiff serves an answer or objection, signed by Plaintiff or her attorney, upon Defendants in accordance with the Federal Rules of Civil Procedure.

### DEFINITIONS

A.    "You" or "your" refers to Plaintiff S. Courtney E. Collier.

B.    The term "Defendants" refers to SEI Investments Company, Todd Cipperman, Edward Loughlin, Richard Lieb, Kevin Johnston, Kevin Robins and Mark Nagle.

## INSTRUCTIONS

You must set forth either an answer or an objection to each Request for Admission. If you object to a Request, you must state the reasons for your objection. You may not object to any request solely on the ground that the matter presents a genuine issue for trial.

In your answer, you must either admit or deny the matter set forth in the requested admission. If you deny a matter set forth in one of these Requests, your denial must fairly meet the substance of the requested admission. If you cannot truthfully admit or deny the matter, your answer must set forth in detail the reasons why you cannot do so. You may not give lack of information or knowledge as a reason for your failure to admit or deny, unless you have conducted a reasonable inquiry into all information readily available to or obtainable by you and that information is insufficient to enable you to admit or deny the matter.

## REQUESTS FOR ADMISSIONS

1.      When Plaintiff was hired as a full time employee at SEI she was paid an annual salary of $75,000.

2.      Plaintiff's salary during her employment with SEI was appropriate, in light of her skills and prior experience.

3.      Plaintiff's salary during her employment with SEI was more than her salary in any position that she held prior to becoming an SEI employee.

4.      Plaintiff was criticized by her supervisors about job performance before she began to report to Defendant Cipperman.

5.      During the period of time when Plaintiff was employed in SEI's legal department, Plaintiff failed to perform her duties satisfactorily as an SEI attorney.

6.      During her employment at SEI, Plaintiff never heard any SEI employee make any racially derogatory comments.

7.      During her employment at SEI, Plaintiff never heard any SEI employee make any derogatory comments about women.

2

8.      Prior to July 2000, Plaintiff did not complain to a superior or a person in a position of authority at SEI that she had been subjected to discrimination on the basis of her race and/or gender.

9.      Upon receiving a complaint of alleged discrimination from Plaintiff in July 2000, SEI promptly initiated an investigation of Plaintiff's complaints.

10.     SEI took reasonable steps to investigate and resolve Plaintiff's complaints of alleged discrimination.

11.     Plaintiff submitted a written summary of her complaints regarding alleged discrimination on July 22, 2000.

12.     Prior to her transfer to the position of Vendor Manager on July 18, 2000, Plaintiff had told SEI representatives that she no longer wanted to work in SEI's legal department.

13.     Plaintiff's salary remained the same when she was transferred outside of the Legal Department to a position as a Vendor Manager.

14.     Plaintiff's fringe benefits remained the same when she was transferred outside of the Legal Department to a position as a Vendor Manager.

15.     Plaintiff's transfer to the position of Vendor Manager was not a demotion.

16.     Plaintiff was never offered a position with SEI in France.

17.     Plaintiff was told prior to June 2000 that she was not going to be transferred to a position in France.

18.     Alice Lindenauer was qualified for the position of Workforce Development Director.

19.     Plaintiff's qualifications for the position of Workforce Development Director were not superior to those of Alice Lindenauer.

20.     At the time that Plaintiff applied for the position of Head of Operations for Mutual Fund Services, Plaintiff lacked experience and background working in that segment of SEI's business for the position.

21.     James Foggo was qualified for the position of Head of Operations for Mutual Fund Services.

22.     Plaintiff's qualifications for the position of Head of Operations for Mutual Fund Services were not superior to those of James Foggo.

3

23.    In January 2000, Plaintiff was not qualified for the position of General Counsel at SEI.

24.    Prior to January 2000, Plaintiff did not apply, or ask to be considered for, the position of General Counsel at SEI.

25.    In January 2000, Todd Cipperman was qualified for the position of General Counsel.

26.    In January 2000, Plaintiff's qualifications for the position of General Counsel were not superior to those of Defendant Cipperman.

27.    In January 2001, Plaintiff's qualifications for the position of General Counsel were not superior to those of Defendant Cipperman.

28.    Plaintiff did apply, or ask to be considered for, the position obtained by Kevin Robins in SEI's Family Wealth Unit.

29.    Plaintiff's qualifications for the position obtained by Defendant Robins in SEI's Family Wealth Unit were not superior to those of Defendant Robins.

30.    Plaintiff's employment with SEI was terminated as part of a reduction in force, which included the elimination of her entire department.


MICHAEL L. BANKS
JENNIFER CALABRESE BELL
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
215.963.5387/5186

DATED:  March 19, 2003

## CERTIFICATE OF SERVICE

I, Jennifer Calabrese Bell, hereby certify that a true and correct copy of Defendants' First

Requests for Admissions Directed to Plaintiff S. Courtney E. Collier has been served via hand

delivery, this 19th day of March, 2003, upon the following:

Alan B. Epstein, Esquire
Seven Penn Center
1635 Market Street, 7th Floor
Philadelphia, PA 19103

_Jennifer Calabrese Bell_
Jennifer Calabrese Bell

Date: March 19, 2003

# EXHIBIT E

| From: | Collier, Courtney E. |
|---|---|
| Sent: | Wednesday, July 12, 2000 12:39 PM |
| To: | Johnston, Kevin B. |
| Cc: | Robins, Kevin P. |
| Subject: | complaint |

Importance:    High

Kevin :

On June 20, 2000 I lodged, for the second time (The 1st was when Todd accused me among other things of not properly informing John Kirk of the risks of firing M.Frey, which wasn't true and you confirmed that. The 3rd was on 7/7/00), a verbal complaint with you regarding unfair treatment of myself by my supervisor, Todd Cipperman. I believe the treatment was discriminatory, based on race and gender. I do not make such serious allegations lightly. Coming to this conclusion was very painful for me, because I would like to believe that my opportunities for success do not depend on my physical attributes. And, I would like to believe that my success or failure with any company depends on what I am willing to put into my job and not something as arbitrary and out of my control as race or gender. That's what I wanted to believe. That's what I still want to believe. I am putting this in writing now for no other reason than to ensure that everyone is clear that I feel that this situation is very serious. Please do not read more into it than that.

As I have expressed to you on many occasions in the past, I wish very much to continue to work with you and Kevin Robins to come to an amicable resolution of the issues involved. You also know that I wish to remain at SEI, just in another position. As, you and Kevin know I have applied for a position for which I very much hope to be chosen. I would appreciate the active support of both Todd and Kevin Robins in this process. As I stated to you yesterday, since Todd has offered to do whatever he can to help me obtain another position within the Company, I would very much appreciate a letter of recommendation from him to the selection committee (or whoever the appropriate individual is). I know that others who were similarly situated were assisted in obtaining positions for which they applied. I would just like the same consideration. This should not be a problem since everyone (You, Kevin Robins and Todd) seems to really want to help me in obtaining a new position.

If anyone has any trepidation about recommending me for whatever reason, I am more than willing to sit down with them and try to eliminate any doubt that I am qualified for the position and would work hard and in the best interest of the Company.

Thank you,

Courtney
*S. Courtney E. Collier*
*Legal Department*
*SEI Investments*
*(610) 676-1839*

D0147

# EXHIBIT F

1  about, you talked in terms of white

2  papers, what else?

3          A.      (Pause.)

4          Q.      When you talked to her after

5  she was in the vendor manager position

6  you said you spoke on the telephone.

7          A.      No, we spoke on the

8  telephone --

9          Q.      The second time?

10         A.      Courtney -- Courtney and I

11  met, she related to me that Todd was

12  treating her unfairly.

13         Q.      Right, that was the first

14  time.  The second time you talked on the

15  telephone.

16         A.      During the course of that

17  first conversation Courtney relays to me

18  that she wanted to move out of the legal

19  department and I indicate to her that I

20  would think about what positions within

21  operations I thought would be appropriate

22  for her.  The second conversation was me

23  relying to her two positions that I think

24  she should consider.

1          Q.      In the white pages.  The

2     white pages lists your name and your

3     group.  Is there a group known as

4     consultant --

5               MS. BELL:    Object to the

6          form.

7               MR. EPSTEIN:    -- at SEI?

8               THE WITNESS:    I'm sorry,

9          say that again.

10    BY MR. EPSTEIN:

11         Q.      Is there a group designated

12    as quote, consultant, unquote, SEI?

13         A.      No, not that I'm aware of.

14         Q.      Was it ever brought to your

15    attention that Courtney was listed as a

16    consultant in the SEI white pages?

17         A.      I don't recall.

18         Q.      Now, the affidavit that was

19    presented to me this morning indicates

20    that you in April of 2002 were involved

21    in the decision to dissolve the vendor

22    management team in the mutual funds

23    operation area; is that correct?

24         A.      Yes.

53

```
 1          Q.      What was your job at that
 2 time?
 3          A.      Head of operations for SEI.
 4          Q.      That's for all operations
 5 not just the mutual fund group?
 6          A.      Yes, yes.
 7          Q.      Did the operations within
 8 the mutual fund group come under your
 9 control as head of operations?
10          A.      Yes.
11          Q.      And were there layoffs in
12 April of 2002 other than the vendor
13 management team?
14          A.      Yes.
15          Q.      Do you know how extensive
16 they were?
17          A.      Not specifically.
18          Q.      It was related to us that
19 there was somewhere between a dozen to
20 two dozen people laid off at SEI at that
21 time.
22                  MS. BELL:    Object to the
23          form.
24 BY MR. EPSTEIN:
```

54

1          Q.      Does that help at all in

2    refreshing your recollection as to how

3    many people were laid off?

4          A.      Again, throughout the

5    company that probably is right at that

6    time.   There had been several waves

7    before and there have been several waves

8    since.   That's probably right at that

9    time.

10         Q.      With regard to the vendor

11   management team, were any of those people

12   given notification prior to the time that

13   they were terminated that they would be

14   terminated so they could look for other

15   positions?

16         A.      Prior to the decision to

17   terminate?

18         Q.      Right.

19         A.      I'm not aware of any

20   communications that took place prior to

21   the decision.

22         Q.      Did you have any

23   conversations with Courtney or with Karen

24   regarding the dissolution of the vendor

55

1  management team?

2          A.      No.

3          Q.      Is the function that they

4  served, vendor management, being carried

5  out by someone?

6          A.      Not a specific function, no.

7          Q.      Not as a specific job.  Is

8  somebody engaging in some form of

9  oversight as to the vendors that are

10 supplying either services or materials to

11 SEI?

12         A.      I can only speak to what

13 we're doing in operations.

14         Q.      Okay, what are you doing in

15 operations?

16         A.      We have distributed those

17 functions out to the managers who

18 interact with the vendors directly.

19         Q.      Do you know how those

20 managers are carrying out those

21 responsibilities?

22         A.      We're in the process of

23 defining how we're going to do that right

24 now.  So no, they're not -- I can't speak

56

1  to specifically what we're doing, we're

2  sorting it out.

3          Q.      In mutual funds who are the

4  vendors that supplied either services or

5  goods to SEI?

6          A.      There are many of them.

7          Q.      Give my some categories?

8          A.      Transfer agents, custodians,

9  law firms -- I'm sorry, accounting firms,

10 technology providers.  And then there are

11 a host of ones that are not terribly

12 strategic, we buy paper, we do all sorts

13 of things.

14         Q.      Those are the strategic

15 people that you spend the most money on

16 in the terms of services?

17         A.      Yes.  Yes.

18         Q.      At the present time is there

19 any individual who is responsible for

20 overseeing the utilization of transfer

21 agents?

22         A.      No.

23         Q.      You don't do any of your own

24 internal transfer work at SEI, do you?

1        A.      Our accounts payable group
2  pays the bills.

3        Q.      Pays the bills.

4        A.      Contracts are -- I don't
5  know that we've negotiated, had to
6  negotiate a contract since.  So there's
7  no specific individual responsible for
8  managing the transfer agents right now.

9        Q.      How many people were
10 eliminated from your operations group in
11 August of 2002?

12       A.      My recollection is it was
13 five or six throughout operations.

14       Q.      Do you have any
15 documentation in which you provided an
16 insight as to your decision to eliminate
17 the vendor management support group?

18       A.      No.

19       Q.      Did you do any analysis in
20 terms of its impact on SEI or what cost
21 savings would be affected by the
22 elimination of that particular group?

23       A.      We did not document any of
24 that analysis.

```
 1            Q.      Did you have discussions

 2   with anyone regarding the decision to

 3   eliminate the vendor manager support

 4   group?

 5            A.      Yes.

 6            Q.      With whom?

 7            A.      Jim Foggo, Marie Reinhart

 8   and Mike Dwyer.

 9            Q.      And Mike who?

10            A.      Dwyer.

11            Q.      Did you have conversations

12   with anybody outside of your group

13   regarding the decision to eliminate the

14   vendor manager support group?

15            A.      Mike Dwyer is outside my

16   group.

17            Q.      Who is Mike Dwyer?

18            A.      Mike Dwyer was head of the

19   mutual fund product organization.

20            Q.      Anyone outside of those

21   individuals?

22            A.      No.

23            Q.      Did you have any

24   conversations in this regard with Rick
```

# EXHIBIT G

TODD CIPPERMAN

96

 1 BY MR. EPSTEIN:

 2         Q.         Always.   I do not want to

 3 hear any discussions you had with counsel

 4 or the tenor of those things.   If my

 5 question calls for a response that would

 6 require you to either directly or

 7 indirectly disclose it, please do not.

 8         A.         Could you repeat the

 9 question then.

10         Q.         Did you have a discussion

11 with anybody regarding Courtney's leaving

12 the Legal Team other than counsel who is

13 sitting with you today?

14         A.         After the meeting with the

15 psychologist.

16         Q.         After the meeting with the

17 psychologist?

18         A.         Yes.

19         Q.         With whom?

20         A.         I discussed it with Kevin

21 Johnston.   I discussed it with Kate

22 Stanton.

23         Q.         Who suggested Courtney's

24 leaving the Legal Team?   You or Kevin

1    Johnston or Kate Stanton or anyone else?

2            A.      I don't recall whether it

3    was Kevin Johnston that first raised it

4    or myself.

5            Q.      Why was it decided that

6    Courtney would leave the Legal Team?

7    What was discussed that led you all to

8    believe that that was necessary?

9            A.      I believe it was Kevin

10   Johnston who informed me, although I

11   can't be sure at this point, that

12   Courtney had indicated that she would not

13   work for me.  Given that I was the head

14   of the legal department, that really left

15   us no alternative but to find another

16   place for her in the organization or to

17   sever the relationship with the

18   organization.

19           Q.      You didn't hear Courtney say

20   that.  This is what you heard from Kevin

21   Johnston?

22           A.      I think it was Kevin

23   Johnston.  I can't be sure at this point.

24   But that was who I was operating under.

TODD CIPPERMAN

9:

1          Q.      Was there any consideration

2    given to assigning Courtney a role, legal

3    in context, that would not require her to

4    directly report to you?

5          A.      Could you repeat the

6    question.

7          Q.      Was there any consideration

8    when you decided to move her, to move her

9    to a position where she would still be

10   acting as a lawyer but not reporting

11   directly to you?

12         A.      I think there was some

13   consideration for that, but not a -- it

14   was not considered, I would say,

15   significantly.

16         Q.      She was moved or reassigned

17   to a position of vendor manager.  Who

18   decided that that would be the role that

19   she would take?  Was that you, Mr.

20   Johnston, Miss Stanton or someone else?

21         A.      I would say it was a

22   combination of myself, Kevin Johnston and

23   Kate Stanton.

24         Q.      Am I correct in stating that

141

1    discharged in April of 2002?

2         A.    I believe it was several

3    dozen.   I don't know the exact number.

4         Q.    How many persons are

5    employed or were employed at that time in

6    approximately a year ago by SEI?

7              MR. BANKS:  A year ago

8         today.

9              MR. EPSTEIN:  Worldwide.

10             MR. BANKS:  A year ago

11        today.

12             MR. EPSTEIN:  Yes.

13        Approximately a year ago today.

14             THE WITNESS:  It was between

15        1,500 and 2,000.  I don't know the

16        exact number.

17   BY MR. EPSTEIN:

18        Q.    Am I correct in stating that

19   approximately one to two percent of SEI's

20   work force then was being reduced?

21             MR. BANKS:  At what time?

22   BY MR. EPSTEIN:

23        Q.    In April of 2002.

24        A.    Yes, but I would have to

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

S. COURTNEY E. COLLIER,

Plaintiff,

v.

SEI INVESTMENTS COMPANY, TODD
CIPPERMAN, EDWARD LOUGHLIN,
RICHARD LIEB, KEVIN JOHNSTON,
KEVIN ROBINS and MARK NAGLE,

Defendants.

Civil Action No.  02-3574

### DECLARATION OF MARK NAGLE

1.    I am employed by SEI Investments Company as Senior Vice President,

Mutual Funds Sales and Services, and have been employed in that capacity during all

periods relevant to the following declaration.

2.    In September 2000, I oversaw the hiring for the position of Head of

Operations, Mutual Funds.

3.    In connection with that hiring process, I reviewed applications and

interviewed several individuals.

4.    I determined that James Foggo was best qualified for the position on the

basis of Mr. Foggo's extensive experience in working with SEI's Mutual Funds groups

while he was employed in SEI's Legal department.  In addition, Mr. Foggo had

significant mutual funds related experience prior to his employment with SEI.  My

decision to choose Mr. Foggo for the Head of Operations position was made solely on the

basis of Mr. Foggo's superior qualifications.

5.      In April 2002, I participated in decisionmaking regarding a reduction in force at SEI.  Specifically, I made decisions regarding cost reduction measures in the Mutual Funds Sales and Services Group.

6.      I made the decision that the Vendor Manager Support Group should be eliminated as part of these cost reduction measures.  My decision to eliminate the Vendor Management Support Group was made solely on the basis of economic considerations relating to the group.  This decision was made without regarding to Courtney Collier's race, gender or prior internal complaint of discrimination.

Executed on May 19, 2003

Mark Nagle

## CERTIFICATE OF SERVICE

I, Jennifer Calabrese Bell, hereby certify that a true and correct copy of

Defendants' Reply Memorandum In Support Of Defendants' Motion for Summary

Judgment has been served via hand delivery, this 18th day of June, 2003, upon the

following:

Alan B. Epstein, Esquire
Seven Penn Center
1635 Market Street, 7th Floor
Philadelphia, PA  19103


Jennifer Calabrese Bell


Date:  June 18, 2003